IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>PEDRO ALBERTO HERNANDEZ,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>Case No. 2:18-CR-120 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant's Motion to Suppress. For the reasons discussed below, the Court will deny the Motion.

I. FINDINGS OF FACT

On January 10, 2018, Sergeant Ryan Bauer, an officer with the Utah Highway Patrol, was observing traffic from his patrol car near milepost 63 on Interstate 15. The posted speed limit in the area is 80 miles per hour. Sergeant Bauer observed a red SUV that was travelling northbound. Sergeant Bauer noticed that the vehicle was traveling faster than the other cars. Sergeant Bauer visually estimated the speed of the red SUV at 84 or 85 miles per hour. Sergeant Bauer then used a radar, which showed that the red SUV was travelling between 83 and 84 miles per hour.

As the red SUV passed Sergeant Bauer's location, he observed that the tint on the front driver's side window appeared to be too dark under Utah state law.[1] While he noticed the

---

[1] Utah law requires the front side windows have at least 43% light transmittances. Utah Code Ann. § 41–6a–1635(1)(b).

window tint as the red SUV passed by, it was the vehicle's speed that first drew Sergeant Bauer's attention.[2]

Based upon the speeding and the possible window tint violation, Sergeant Bauer initiated a stop of the vehicle. When Sergeant Bauer activated his lights, his dash cam was also activated, recording the stop beginning thirty seconds prior to the activation of the lights.

After the vehicle stopped, Sergeant Bauer approached and made contact with Defendant, the driver of the vehicle. A female passenger was also in the vehicle. Sergeant Bauer asked Defendant for his license and the vehicle's registration. While Defendant was gathering the documentation, Sergeant Bauer informed Defendant that the window tinting appeared too dark but did not say anything about speeding at that time. Defendant expressed surprise about the window tint and Sergeant Bauer stated that it did not appear as dark as he initially believed. However, Sergeant Bauer did not test the window tint at that time.[3]

Sergeant Bauer then asked the occupants of the vehicle about their travel plans. Defendant stated that they were travelling to Denver. When asked whether the car belonged to him, Defendant stated it did not. Throughout the encounter, Defendant provided inconsistent statements about who owned the car.[4] Defendant then informed Sergeant Bauer that he did not have a license. He later informed Sergeant Bauer that his license was suspended.

---

[2] Docket No. 26, at 70:13–17.

[3] Sergeant Bauer is able to verify whether a window has too much tint using a meter that measures light transmittance. Sergeant Bauer keeps this meter near the backseat of his patrol car. He does not take the window tint meter with him when he first approaches a vehicle. Instead, Sergeant Bauer's typical practice is to ask for a license and registration. Once those materials are received, he will then go back to retrieve the meter to test the windows.

[4] Defendant has now clarified that he believed that car belonged to his friend, Jose Rodriguez. Docket No. 29, Ex. A.

2

Defendant then produced documentation regarding the vehicle, which conflicted with Defendant's statements about the ownership of the car.[5] During this exchange, Sergeant Bauer noticed that Defendant was extremely nervous.

Sergeant Bauer then brought Defendant back to his patrol car. Soon after entering the patrol car, Defendant informed Sergeant Bauer that he might have a warrant for his arrest out of California. At that point, Sergeant Bauer stated, for the first time, that he also pulled Defendant over for speeding. Defendant denied that he was speeding.

Sergeant Bauer continued to attempt to determine who owned the car. Defendant stated that he did not know who purchased the car.

Sergeant Bauer then asked Defendant about the passenger. Defendant stated that her name was Maria. That name did not match the identification card the passenger had provided. Additionally, Defendant stated that he had known the passenger for about a year but did not know her last name.

About nine minutes into the stop, Sergeant Bauer asked for a K-9 unit to assist him. Sergeant Bauer then contacted dispatch to run the information Defendant and the passenger had provided. While waiting for dispatch, Sergeant Bauer continued to ask Defendant about his license status, the possible warrant, the owner of the car, and their travel plans. During this period, Defendant informed Sergeant Bauer that he was on probation in California for having a stolen car and had not informed his probation officer that he was leaving the state.

---

[5] A purchase agreement and a temporary registration decal identified the purchaser of the vehicle as David Lozu Gil. Hearing Exs. 7, 11.

Another officer, Trooper Mackelprang, arrived with his K-9 about twenty-one minutes into the stop. Trooper Mackelprang had the passenger exit the vehicle. Trooper Mackelprang then ran his dog around the car beginning approximately twenty-four minutes into the stop. The dog alerted to the car, indicating the presence of narcotics. After the dog indicated, dispatch informed Sergeant Bauer that it had confirmed that Defendant's license was suspended.[6]

Sergeant Bauer then requested permission to search the car. Defendant stated that he would not say yes, but would also not say no. The officers then conducted a search of the car. They located several packages of methamphetamine behind the molding of the rear door.

## II. DISCUSSION

"Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, the principles set forth in *Terry v. Ohio* guide [our] determination as to the reasonableness of a traffic stop."[7] "Under the Fourth Amendment, the determination of whether an investigatory detention is constitutional entails a two-step analysis: the detention is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place."[8]

Defendant concedes that the stop was justified at its inception, but challenges the scope and duration of the stop.[9] "[A] seizure that is lawful at its inception can violate the Fourth

---

[6] Dispatch attempted to contact Sergeant Bauer while Trooper Mackelprang was deploying his dog. However, Sergeant Bauer asked them to hold on. Defendant does not appear to be arguing that this brief delay unlawfully extended the stop.

[7] *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012) (quotation marks and citation omitted).

[8] *Id.* at 867 (internal quotation marks omitted).

[9] Docket No. 21, at 1 ("Mr. Hernandez concedes the traffic stop was lawful at inception.").

4

Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."[10] "An investigative detention must be temporary, 'last[ing] no longer than is necessary to effectuate th[e] purpose' of the stop, which, in the case of a traffic stop, is 'to address the traffic violation that warranted the stop' in the first place."[11]

> As part of a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. An officer may also generally inquire about the driver's travel plans, and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop. But [o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave.[12]

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[13]

The question raised by Defendant's Motion is the reason for the stop. As stated, a stop must last no longer than is necessary to effectuate the purpose of the stop. In his testimony, Sergeant Bauer proffered two justifications for the stop: a speeding violation and a possible window tint violation. Defendant concedes that if Sergeant Bauer stopped Defendant for both these reasons, "the stop was lawfully extended after Bauer's suspicions about window tint dissipated."[14] However, if Sergeant Bauer only stopped Defendant for the window tint violation,

---

[10] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[11] *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015) (quoting *Rodriguez v. United States*, ---U.S.---, 135 S.Ct. 1609, 1614 (2015)).

[12] *Id.* at 1228–29 (alteration in original) (internal citations and quotation marks omitted).

[13] *Rodriguez*, 135 S.Ct. at 1612; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

[14] Docket No. 29, at 2.

5

"then the stop became unlawful after Bauer's suspicions about tint dissipated (or reasonably should have)."[15]

Based upon Defendant's concession, the Court will limit it discussion to the issue of whether Sergeant Bauer had more than one justification for the stop. The answer to this question, as Defendant notes, "boils down to credibility."[16] Defendant argues that Sergeant Bauer's testimony that he pulled Defendant over for speeding should not be believed because he did not inform Defendant that he stopped the car for speeding when he first approached the vehicle. Instead, Sergeant Bauer waited to tell Defendant about the speeding issue until after he knew or should have known that the window tint was legal.

The Court disagrees with Defendant's credibility assessment. The Court finds Sergeant Bauer's testimony to be credible. Sergeant Bauer testified that the speed of the vehicle was what first drew his attention. Sergeant Bauer also testified that he visually estimated the speed and then confirmed his estimate using a radar gun. Further, during the traffic stop he informed Defendant that he pulled him over, in part, for speeding. Sergeant Bauer specifically told Defendant he was driving between 83 and 84 miles per hour, which is consistent with his report[17] and his testimony at the hearing.[18] While Sergeant Bauer did not inform Defendant of the speeding violation when he first approached the vehicle, Defendant points to no requirement that an officer must immediately inform a driver of all reasons for a particular stop. Indeed, Sergeant Bauer testified that he did not talk to Defendant about the speeding because the stop

---

[15] *Id.*

[16] *Id.* at 1.

[17] Hearing Ex. 1.

[18] Docket No. 26, at 16:1–17:17, 46:17–47:25, 70:13–17, 71:24–72:4.

developed so quickly.[19] Having observed the officer during his testimony and reviewed all of the evidence, the Court finds his testimony—that one of the justifications for the stop was that Defendant was speeding—to be credible.

A further problem with Defendant's argument is that it assumes that Sergeant Bauer knew (or should have known) that the window tint was legal shortly after the stop began, if not sooner. However, there is a lack evidence to support this assumption. Sergeant Bauer did testify that he is able to identify illegal window tint with a high degree of accuracy and that when he got closer to the vehicle, the tint did not look as dark as it had appeared when he first saw the car. But, because of the way the stop developed, Sergeant Bauer did not get the opportunity to test the tint right away. Rather, the window tint was not tested until long after the stop had concluded. When it was ultimately tested, the tint was within 5% of what is allowed by Utah law. There is nothing to suggest that Sergeant Bauer knew or should have known this at the time of the stop or shortly after it began. Rather, he testified that he would not know if the tint was actually illegal until he tested it.[20]

Moreover, Sergeant Bauer began to develop reasonable suspicion of other criminal activity almost immediately after the stop began. "[I]f the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, the officer may detain the driver for questioning unrelated to the purpose of the initial traffic stop."[21] Here, soon after the stop began, Defendant informed the officer that he did not have a license and that it was suspended. Defendant also stated that he was not the owner of the vehicle and provided

---

[19] *Id.* at 72:13–25.

[20] *Id.* at 74:3–4.

[21] *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001).

7

conflicting statements about who did own the car, statements that in turn conflicted with the documents Defendant provided to Sergeant Bauer. Defendant further admitted that he was on probation for having a stolen car and might have a warrant out for his arrest. These facts provided reasonable suspicion that Defendant may have been engaged in a host of illegal activity, thereby authorizing the continued detention. Subsequently, the dog's alert provided probable cause to search the vehicle.[22]

### III. CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Suppress Evidence (Docket No. 21) is DENIED. Pursuant to 18 U.S.C. § 3161(h)(1)(D), (H), the time from the filing of the Motion to the date of this order is excluded from computation under the Speedy Trial Act. The Court will set this matter for a status conference to establish further deadlines.

DATED this 10th day of October, 2018.

BY THE COURT:

Ted Stewart
United States District Judge

---

[22] *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) ("A canine alert gives rise to probable cause to search a vehicle.").